**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Victor COWLEY and Michael St. Clair,**
**Defendants-Appellants.**

**Nos. 82–1741, 82–1742.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 10, 1983.

Decided Nov. 15, 1983.

Sandra Teters, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Anne Flower Cumings, John W. Keker, Christopher J. Hunt, David Meadows, Keker & Brockett, San Francisco, Cal., for defendants-appellants.

Before TUTTLE,* PREGERSON and REINHARDT, Circuit Judges.

PREGERSON, Circuit Judge:

Appellants St. Clair and Cowley were convicted of violating 18 U.S.C. § 1623 for willfully and knowingly making material false declarations before a grand jury (perjury). St. Clair was convicted under counts 2 and 3; Cowley was convicted under count 4. Both appeal their convictions. St. Clair's conviction is affirmed as to count 2 and reversed as to count 3. Cowley's conviction is reversed.

FACTS

St. Clair conducted business in the field of international finance as Channel Associates, located in Santa Barbara. Cowley was employed in that business. In late 1979 or early 1980, James Paige, controller of Holland Oil Company, telephoned St. Clair and explained that he wanted two cashier's checks to be cashed abroad. St. Clair agreed to cash the checks for a $25,000 fee. On February 11, 1980, Paige purchased two cashier's checks from a San Francisco bank, one for $432,946.44 and another for $670,051.00 and, at St. Clair's suggestion, designated "Templeton Company" as payee. On the same day, Paige flew to Santa Barbara and delivered the checks to St. Clair. On February 27, 1980, St. Clair and Cowley flew to Anguilla in the British West Indies, where St. Clair made an initial $50 deposit in a "Templeton Company" account at the International Investment Bank. On February 28, St. Clair and Cowley deposited the two cashier's checks in the Templeton account and instructed the bank manager to send a deposit receipt to a Mr. Andrew Templeton at a Tokyo address.

When problems arose in clearing the checks, the bank manager from the International Investment Bank tried unsuccessfully to contact Mr. Templeton. He attempted to call Templeton and sent a cable and a letter to his address in Tokyo, but was never able to locate or reach him. The manager testified that before the two cashier's checks cleared he received two letters purporting to be from Mr. Templeton, one of which bore a "Santa Barbara" postmark. When the checks finally cleared in April 1980, St. Clair advised Paige that the money was in a Swiss bank account.

The pivotal factual dispute centers on Andrew Templeton's role in the banking transaction. Appellants contend that while they were at the airport on the island of Antigua, they happened to meet Templeton, who, after learning that they were on their way to Anguilla, asked them if they would deposit the contents of an envelope at the International Investment Bank. Cowley contends that he first met Templeton at that meeting, while St. Clair testified that he had met Templeton once previously in Nassau. The government contends that Templeton does not exist except as a fictional character in a money laundering scheme devised by appellants and Paige. There was evidence indicating that no one by the name of Templeton arrived in Anguilla between December 1, 1979 and April 30, 1980. The evidence, however, did show that on February 27, 1980, St. Clair and Cowley entered Anguilla Island by air. On that date an account in the name of the Templeton Company was opened at the International Investment Bank. The first deposit was $50.00. The next day the two cashier's checks were deposited in that account.

In December 1981, St. Clair and Cowley were subpoenaed to appear before a federal grand jury investigating Holland Oil Company. Shortly after appearing, they were jointly indicted for perjury in connection with their grand jury testimony. They moved for separate trials, and their motions were granted. Thereafter, the government went before the grand jury and obtained a

* Hon. Elbert Tuttle, Senior United States Circuit Judge for the Eleventh Circuit, sitting by designation.

superseding indictment charging appellants under 18 U.S.C. § 371 with conspiracy to obstruct justice and to make false statements to a grand jury. The superseding indictment also charged appellants with substantive perjury violations. Appellants again moved for severance, but their motions were denied. After the government presented its case, the court granted appellants' motions for judgment of acquittal on the conspiracy count. Appellants again moved for severance but were unsuccessful. At the conclusion of a seven-day trial, the jury found St. Clair guilty of two counts of perjury and Cowley guilty of one count of perjury.

In these consolidated appeals, appellants contend that their convictions should be reversed because (1) they were prejudicially misjoined; (2) the prosecutor's questions were ambiguous, and therefore their answers were not perjurious; (3) it was error to admit hearsay testimony concerning the Santa Barbara postmark; and (4) they were unlawfully denied the opportunity to examine statements made by Paige, the key government witness, to the Federal Bureau of Investigation (FBI).

## STANDARD OF REVIEW

■ In reviewing the trial court's rulings on misjoinder, admission of hearsay testimony concerning the Santa Barbara postmark, and Paige's statements to the FBI, we are governed by the abuse of discretion standard.[1] In reviewing the perjury counts, we apply a *de novo* standard.[2]

## MISJOINDER

■ The trial court originally ruled that defendants were misjoined under Fed.R. Crim.P. 8(b)[3] and ordered a severance. The government then filed a superseding indictment charging appellants with conspiracy to obstruct justice and to make false statements to a grand jury in violation of 18 U.S.C. § 371. The addition of the conspiracy count to the earlier perjury counts made joinder proper under Rule 8(b). The appellants' renewed motion for severance was denied. However, at the close of the government's case, the district court granted appellants' motion for judgment of acquittal on the conspiracy count. Appellants again moved for severance. The district court denied the motion on two grounds. The court found no evidence of bad faith on the government's part in bringing the additional conspiracy charge and also concluded that appellants suffered no prejudice as a result of the joinder.

1. The standard of review for determining whether a severance motion should have been granted under Fed.R.Crim.P. 14 is abuse of discretion. *United States v. Abushi,* 682 F.2d 1289, 1296 (9th Cir.1982); *United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.1980), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980). The standard of review of a district court's ruling to admit evidence over a hearsay objection is abuse of discretion. *United States v. Perlmuter,* 693 F.2d 1290, 1293 (9th Cir.1982) *citing United States v. Burreson,* 643 F.2d 1344, 1349 (9th Cir.1981), *cert. denied,* 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981). A trial judge's ruling that the government need not produce a witness's statement under the Jencks Act will not be overturned on appeal absent a clear showing of abuse of discretion. *United States v. Augenblick,* 393 U.S. 348, 355, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969); *United States v. Singh,* 628 F.2d 758, 765 (2d Cir. 1980), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980).

2. The standard of review when examining a perjury indictment is *de novo;* the central question is whether the jury could conclude "beyond a reasonable doubt that the defendant understood the question as did the government and that, so understood, the defendant's answer was false." *United States v. Matthews,* 589 F.2d 442, 445 (9th Cir.1978), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979); *see United States v. Cook,* 489 F.2d 286 (9th Cir.1973).

3. Fed.R.Crim.P. 8(b) states that "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."

Fed.R.Crim.P. 14 states that
[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Appellants contend that bringing a conspiracy charge after the court granted severance is prima facie evidence of the government's bad faith requiring reversal of their convictions. From a review of the record, however, we are unable to say that the trial judge abused his discretion when he denied severance. It appears that the government did not act in bad faith, as it had a reasonable expectation that sufficient proof of a conspiracy would be forthcoming at trial. *See United States v. Ong,* 541 F.2d 331, 337 (2d Cir.1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977).[4]

Further, appellants argue that they were prejudiced by the joinder so as to require reversal.

> The party seeking reversal of a decision denying severance under Rule 14 has the burden of proving "clear," "manifest," or "undue" prejudice from the joint trial. (Citations omitted.) Such a party must show more than that a separate trial would have given him a better chance for acquittal. (Citations omitted.) He must also show violation of one of his substantive rights by reason of the joint trial: unavailability of full cross-examination, lack of opportunity to present an individual defense, denial of Sixth Amendment confrontation rights, lack of separate counsel among defendants with conflicting interests, or failure properly to instruct the jury on the admissibility of evidence as to each defendant. (Citations omitted.) In other words, the prejudice must have been of such magnitude that the defendant was denied a fair trial. (Citations omitted.) Clearly, this is not an easy burden to meet.

> The prime consideration in assessing the prejudicial effect of the joint trial is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants, in view of its volume and the limited admissibility of some of the evidence. (Citations omitted.) The prejudicial effect of evidence relating to the guilt of codefendants is generally held to be neutralized by careful instruction by the trial judge. (Citations omitted.)

*United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.1980), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

Appellants have not shown the requisite prejudice. Their stories were similar, thus the risk of the jury confusing the evidence with respect to each appellant was minimal. No violation of a substantive right by reason of a joint trial was shown. Furthermore, during the course of the trial, the judge was careful to give limiting instructions advising the jury that certain evidence was admitted only against a particular defendant. We therefore conclude that the trial judge did not abuse his discretion when he denied severance.

## PERJURY COUNTS

Appellants contend that the perjury counts are fatally flawed for two reasons: (1) the prosecutor's grand jury questions, restated in the indictment, are ambiguous; and (2) the statements in the indictment's truth paragraph are not in stark contrast with appellants' answers before the grand jury. For the reasons set forth below, we affirm the conviction on Count 2 and reverse on Counts 3 and 4.

---

4. *United States v. Rosales-Lopez,* 617 F.2d 1349 (9th Cir.1980), provides an additional basis for upholding the district court's severance order. There we said:

> Our circuit has refused to find the action of the prosecutor in reindicting a defendant vindictive where the charges contained in the second indictment expose the defendant to no greater risk of punishment than did those contained in the first indictment. (Citations omitted.)

*Id.* at 1357.

In the instant case, the first indictment charged St. Clair with three counts and Cowley with two counts of violating 18 U.S.C. § 1623. Each count carried a maximum penalty of five years imprisonment or a $10,000 fine, or both. The superseding indictment charged St. Clair with two counts and Cowley with one count of violating section 1623. In addition, each defendant was named in the conspiracy count, 18 U.S.C. § 371, which also carried a maximum penalty of five years imprisonment or a $10,000 fine, or both. Thus, each defendant was exposed under the superseding indictment to no greater risk of punishment than under the original indictment.

*Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), clearly states the basic ingredient of a successful perjury prosecution: "Precise questioning is imperative as a predicate for the offense of perjury." *Id.* at 362, 93 S.Ct. at 602. Stated another way: "The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360, 93 S.Ct. at 601. Moreover, as the Third Circuit correctly cautioned: "No guessing is tolerated and the indictment must set out the allegedly perjurious statements and the objective truth in stark contrast so that the claim of falsity is clear to all who read the charge." *United States v. Tonelli,* 577 F.2d 194, 195 (3d Cir.1978). With these precepts in mind, we examine each count separately.

*Count 2—St. Clair*

■ At the grand jury hearing, St. Clair identified two cashier's checks, one for $670,051, the other for $432,947—both made out to the Templeton Company. He was then asked the questions and gave the answers repeated in Count 2 of the superseding indictment.

Q. Now, are you familiar with these two checks? Do you recognize them?

A. Yes.

Q. How do you recognize them?

A. As I indicated earlier to you, they appear to be checks that were given to me in a sealed envelope by Mr. Templeton and he asked if I would deposit them.

The truth paragraph in the indictment states:

The above testimony of Michael J. St. Clair, as he then well knew and believed, was false, in that James W. Paige caused the Templeton checks to be delivered to Michael J. St. Clair. The checks were not given to Michael J. St. Clair by a "Mr. Templeton."

St. Clair contends that the first sentence of the truth paragraph does not contradict his testimony because that sentence could be understood to mean that Paige did not personally deliver the checks but instead *caused* them to be delivered by Mr. Templeton and, as so understood, the first sentence contradicts the second. However, the truth paragraph must be read as a whole. The first sentence is merely prefatory to the second, which clearly states the gist of the truth allegation—that the checks were not given to St. Clair by Mr. Templeton. St. Clair testified to the contrary—that Mr. Templeton gave him the checks. Although the government could have drafted the truth paragraph with greater precision, it does, in our view, sufficiently set out the allegedly perjurious statement and objective truth with stark contrast. *Bronston,* 409 U.S. at 362, 93 S.Ct. at 601–602; *Tonelli,* 577 F.2d at 195.

*Count 3—St. Clair*

■ St. Clair appeared before the grand jury on January 7, 1982, and produced four documents: a copy of a check for $25,000 from Jack Holland & Son, Inc., a letter to St. Clair from a lawyer named Hernand, a copy of a letter sent by St. Clair to the managing director of the bank in Anguilla, and a teletype from the managing director to St. Clair. After identifying these documents, St. Clair was asked the questions and gave the answers repeated in Count 3 of the superseding indictment.

Q. Other than these four items, . . . do you have any other records in any way relating to Mr. Paige, Dalziel, Zenith Petroleum, Jack Holland, Jr., Perlman, Templeton Company?

A. Nothing.

Q. Have you prior to date of service of the subpoena any other records relating to those records, entities or persons?

A. No.

After St. Clair's grand jury appearance, a search warrant was executed at the premises of Channel Associates. A file, entitled "St. Mawr, Paid Bills" was found. "St. Mawr" was an entity created by James Paige with which Channel had business dealings. Templeton Company stationery was also found. On that basis, the truth paragraph of Count 3 charged:

The above testimony of Michael J. St. Clair as he then well knew and believed was false, in that Michael J. St. Clair had possession or control of other documents, not produced to the Grand Jury, relating to James W. Paige and "The Templeton Company."

Appellant St. Clair argues that his responses do not constitute perjury because the questions were ambiguous. He argues convincingly that the first question can reasonably be understood to ask him whether he had the described documents with him in the grand jury room, making his answer literally true. Contrary to the government's assertion, the question that follows does not clear up the ambiguity since it is also phrased in the present tense.

The government concedes that there is a grammatical error in the second question, but contends that the second question clarifies the first. The government argues that, if the second question indeed referred to documents St. Clair had with him in the grand jury room, then the examiner would be asking the same question twice. The government seems to argue that St. Clair's interpretation is implausible because it would mean the examiner was redundant. This argument is unpersuasive since examiners often repeat a question.

The ambiguity of the second question arises from the inquiry, "[h]ave you prior to date of service of subpoena any other records ...?" This ill-phrased question, which seems to refer to both the present and past, can reasonably be interpreted as asking the witness: Did you have any other records prior to date of service of subpoena? Or as asking him: Do you now have other records that you had prior to the date of service of subpoena? The fact that documents relating to Paige and the Templeton Company were found at the premises of Channel Associates after St. Clair's grand jury appearance does not establish that St. Clair had those records before the date of service of subpoena or that he had them on his person or under his control when he appeared before the grand jury. In short, there is no stark contrast between the al-legedly perjurious statements and the truth allegations. This being so, we rule that a jury could not conclude beyond a reasonable doubt that St. Clair understood the question as did the government to call for records that he might have had prior to the date of service of subpoena and that so understood, appellant's answer was false. Therefore, the conviction may not stand. *United States v. Matthews,* 589 F.2d 442, 445 (9th Cir.1978), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979).

*Count 4—Cowley*

■ Before the grand jury Cowley was asked the following questions and gave the following answers stated in Count 4 of the indictment.

Q. Now, you were introduced to Mr. Templeton by Mr. St. Clair?

A. That's correct.

Q. Did you have a conversation? Did the three of you have a conversation at that time?

A. Yes. A brief one, yes.

Q. In the course of the conversation, were you asked, or Mr. St. Clair asked, to do something?

A. Yes.

Q. What were you asked to do?

A. We were asked if we were going—it came up in the conversation that we were going to Anguilla, and we were asked if we would take something with us to Anguilla.

Q. What were you asked to take to Anguilla?

A. An envelope to be deposited or to be given to a bank in Anguilla.

Q. To whom was the envelope given?

A. Mr. St. Clair.

The truth paragraph of Count 4 states: The above testimony of Victor J. Cowley, as he then well knew and believed, was false, in that he then well knew and believed that James W. Paige caused the Templeton checks to be delivered to Michael J. St. Clair. He knew the checks purportedly contained in the envelope re-

ferred to were not given to Michael James St. Clair by a "Mr. Templeton."

Appellant Cowley argues that this count is defective in that the truth paragraph does not state the converse of his grand jury testimony. That testimony concerns an envelope given to St. Clair. The thrust of the truth paragraph relates to checks. Though Cowley talked about an envelope to be given to a bank, there is not one word about checks in his grand jury testimony quoted in Count 4. The examiner should have been more precise in his questioning. "It is the responsibility of the lawyer to probe .... If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination." *Bronston,* 409 U.S. at 358–59, 93 S.Ct. at 600. The questioner was not precise. He failed "to pin the witness down to the specific object of the questioner's inquiry. *Id.* at 360, 93 S.Ct. at 600–601. Count 4 fails to set out in "stark contrast" the allegedly false statements and the objective truth. *Tonelli,* 577 F.2d at 195. Therefore, the conviction is reversed. *See United States v. Slawik,* 548 F.2d 75, 83 (3d Cir.1977).

ADMISSION OF TESTIMONY CONCERNING THE POSTMARK

The trial judge allowed the managing director of the International Investment Bank in Anguilla to testify, over objection, that he had received two letters purporting to be from a Mr. Templeton, one of which bore a Santa Barbara postmark. The letters were never produced at trial.

Appellants raise two objections to the admission of the banker's testimony. First, they contend that because the postmark was not authenticated at trial, the trial judge abused his discretion by admitting the testimony about it. Second, appellants argue that the postmark was an out of court statement offered to prove the truth of the matter it asserted—i.e., that the postmark was hearsay. *See* Fed.R.Evid. 801. They contend that since the postmark did not fall within any of the exceptions to the hearsay rule, the trial judge abused his

discretion by admitting the banker's testimony for this additional reason. Finally, appellants claim that the admission of the testimony was not harmless and constituted reversible error.

We will address each of these contentions in order. First, we hold that the proponent of the banker's testimony, the government, was not required to authenticate the postmark as such. Fed.R.Evid. 901(a) states:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that *the matter in question is what its proponent claims.*

(Emphasis added).

If the government had offered the envelope bearing the postmark into evidence, it would have been required to provide circumstantial evidence that the matter in question—the envelope bearing the postmark—was authentic. In this case, however, the government sought to introduce testimony about the postmark, not the postmark itself. Live testimony from the witness stand requires no extrinsic evidence of authenticity.

Second, we do agree, on the other hand, that the testimony was inadmissible hearsay. Fed.R.Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The postmark meets this definition. Although a machine affixes the mark, a postal official is responsible for setting the machine and causing the letters to pass through it. The postmark is thus the postal official's written assertion that the letter passed through his hands at the Santa Barbara post office on a particular day. Because the government offered the testimony about the postmark to prove that the letter was mailed from Santa Barbara—exactly what the mark asserts—the postmark is hearsay.

Unlike most hearsay, however, the postmark is very reliable; there is little risk of

misperception or fabrication on the part of the postal official. Even though it does not easily fit into any of the enumerated hearsay exceptions, *see* Fed.R.Evid. 803(1)–(23), the postmark's circumstantial guarantees of trustworthiness make it a perfect candidate for Fed.R.Evid. 803(24), the so-called "expanding exception":

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. *However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.*

(Emphasis added).

In this case, the government did not give the appellants advance notice of its intention to offer the banker's testimony about the postmark into evidence. Therefore, although we find that the testimony could have fallen within Fed.R.Evid. 803(24), the lack of notice made it inadmissible hearsay.

Nevertheless, we hold that the error in admission was harmless. Since there was abundant evidence, aside from the testimony about the postmark, to support the jury's conclusion that Templeton did not exist, we find that the trial judge's admission of the testimony does not merit reversal.

## PAIGE'S STATEMENTS TO THE FBI

■ St. Clair and Cowley filed discovery motions seeking, among other things, statements that Paige, the key government witness, made to the FBI. The government objected to disclosure of the statements contending that they were irrelevant and submitted them to the district court for *in camera* inspection. The district judge stated preliminarily that the documents were irrelevant, but reserved his final ruling until after Paige testified. Appellants never renewed their motions and the reports were never disclosed. The appellants now contend that *any* statement made by Paige is relevant to their case and therefore should have been produced under 18 U.S.C. § 3500(b), the Jencks Act.[5]

Pursuant to 18 U.S.C. § 3500(b), a defendant is entitled to receive, upon motion, "any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(c) provides for an *in camera* inspection procedure.

The defense is not automatically entitled to production of all statements in the possession of the government made by a prosecution witness. The Jencks Act requires disclosure of only statements related to the witness's direct testimony. *United States v. Jones,* 612 F.2d 453, 456 (9th Cir.1979) *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); *United States v. Knowles,* 594 F.2d 753, 755 (9th Cir.1979). If the government contends that all or part of a statement is unrelated to the witness's testimony, then an *in camera* inspection and excision by the district judge is a sound method for rendering Jencks Act material

---

5. Appellants also requested the statements pursuant to *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963). Under *Brady,* a defendant is entitled to any exculpatory evidence in the possession of the government. *Id.* at 87–88, 83 S.Ct. at 1196–1197. Here the government contended that Paige's statements to the FBI were unrelated to the witness's testimony concerning appellants and gave the statements to the trial court for an *in camera* inspection. An *in camera* inspection is a sound approach to a *Brady* inquiry. *United States v. Jones,* 612 F.2d 453, 456 (9th Cir.1979) *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980).

available to the defense. *United States v. Jones,* 612 F.2d at 456.

In this case, the trial court examined the materials *in camera* and did not find them to be relevant to appellants' trial.

Furthermore, this court has independently reviewed Paige's statements to the FBI and it does not appear that anything in the statements pertains to either of the appellants or the "Templeton" transactions.

CONCLUSION

Based on the above discussion, St. Clair's conviction on Count 2 is affirmed; his conviction on Count 3 is reversed. Cowley's conviction on Count 4 is reversed.

AFFIRMED IN PART AND REVERSED IN PART.