UNITED STATES of America,
Plaintiff–Appellee,

v.

Janice WALLACE,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Elmore PENN, Defendant–Appellant.

Nos. 86–3146, 86–3147.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 7, 1987.

Decided May 26, 1988.

As Amended June 8, 1988.

John W. Lundin, Seattle, Wash., for defendant-appellant.

W.H. Redkey, Jr., Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Before FLETCHER and NORRIS, Circuit Judges, and LYNCH,* District Judge.

FLETCHER, Circuit Judge:

Appellants Janice Wallace and Elmore Penn were convicted, after jury trial, on both conspiracy and substantive counts of possession with intent to distribute heroin.[1] They appeal their convictions, alleging the following errors: (1) the district court's denial of Wallace's motion to dismiss her indictment due to governmental bad faith and preindictment delay; (2) the government's failure to produce notes used by a government witness in her testimony before the grand jury under the Jencks Act; (3) the district court's admission of Wallace's prior heroin conviction to impeach her testimony under Fed.R.Evid. 609; (4) the prosecutor's vouching for a government witness's credibility; and (5) the district court's conclusion that Wallace had waived her *Miranda* rights and its subsequent admission of statements made by Wallace after her arrest. We remand to the district court for further proceedings.

## BACKGROUND

In 1984, local law enforcement officials in Anchorage, Alaska, investigated a multi-state heroin trafficking operation run from the home of Doris Sterling, the "Queen Bee" of the heroin underworld in Anchorage. The investigation uncovered a network that apparently included individuals

---

* Honorable Eugene F. Lynch, United States District Judge, Northern District of California, sitting by designation.

1. The grand jury returned a 26 count indictment charging Wallace and Penn with violations of various federal narcotics laws. Count I alleged a conspiracy between Wallace, a resident of Los Angeles, California, Penn, a resident of Seattle, Washington, and Doris Sterling, a resident of Anchorage, Alaska, and others to distribute and possess with intent to distribute heroin in viola-

tion of 21 U.S.C. § 846. The remaining counts charged Wallace and Penn with activities involving their own or their coconspirator's conduct, traveling in interstate commerce to facilitate the distribution of heroin, 18 U.S.C. § 1952(a)(3), distributing heroin, 21 U.S.C. § 841(a), or using a communication facility, i.e., a telephone, to facilitate the distribution of heroin, 21 U.S.C. §§ 843(b), (c). Wallace and Penn were both convicted on 23 counts.

in the states of California and Washington. It also revealed that Doris Sterling and Sandra Chandler, an Alaskan "courier" for Sterling, made several trips in 1984 to Los Angeles and Seattle. On her visits to Seattle, Doris Sterling was met at the airport by Elmore Penn and stayed at his residence, which was, in fact, owned by Janice Wallace, normally a resident of Los Angeles. On October 25, 1984, officers tracked Sterling from her Anchorage residence to the Seattle residence. The next day, Sterling was arrested at her Anchorage residence immediately following an undercover agent's purchase of heroin from her.

The same day in Seattle, DEA agents executed a search warrant at Penn's residence, where they discovered and arrested both Penn and Wallace. The October 26 search of the Seattle residence yielded, among other items, $30,000 cash hidden in a ladies' size 9–C cowboy boot. Approximately $10,000 of the $30,000 was money previously "marked" and used by an undercover officer in a series of heroin purchases from Sterling. The boot apparently fits appellant Wallace and was found in the bedroom that was being used by her. The search of that bedroom also revealed a cocaine handbook, a heat tester, notes referring to cocaine prices in Seattle, an address book with an apparent reference to Doris Sterling, a hand scale, and other items that could be used in the processing or distribution of cocaine. The search, however, did not uncover any heroin, cocaine, or other illegal narcotics.

In return for the Government's promise not to prosecute her for federal narcotics offenses, Doris Sterling eventually agreed to be a cooperating government witness in the prosecution of Wallace and Penn.[2] Sterling was the Government's star witness at trial. In lengthy testimony, she described nine trips by herself or others to Seattle or Los Angeles to obtain heroin for distribution in Anchorage. Sterling testi-fied extensively regarding heroin purchases from Wallace and Penn. Parts of her testimony were corroborated by various documentary evidence, such as airline tickets and telephone-call records, and by testimony from several Alaskan law enforcement officers and Seattle DEA agents involved in the undercover and surveillance operations. However, Sterling's testimony by itself was the key to establishing the purpose of the trips to Seattle and Los Angeles and, thus, the participation, if any, of Wallace and Penn in the heroin trafficking operation.

## DISCUSSION

### I. *The Wallace Indictments*

Wallace was initially indicted on November 21, 1984, on one count of aiding and abetting the distribution of heroin. On December 20, 1984, the United States Attorney moved to dismiss the indictment without prejudice, asserting the initiation of an investigation into possible tax violations as the basis for the dismissal. Wallace's attorney consented to the dismissal.[3] The district court granted the government's motion under Fed.R.Crim.P. 48(a).

Thirteen months later, in January of 1986, Wallace was reindicted on 26 counts involving various narcotics offenses, but no counts involving any tax violations. Wallace contends that the district court erred in denying her motion to dismiss the 1986 indictment, asserting that the government's bad faith in seeking the dismissal of the 1984 indictment violated Fed.R.Crim.P. 48(a) and that the thirteen month delay between dismissal of the 1984 indictment and her reindictment in 1986 violated the Sixth Amendment's speedy trial guarantee and the Fifth Amendment's due process clause.

### A. *Rule 48(a).*

Rule 48(a) provides that the "United States attorney may by leave of court file a

---

2. Though the federal government declined to prosecute Sterling in exchange for her testimony, the State of Alaska pursued her on related charges. Sterling and the State of Alaska subsequently entered into a plea agreement that provided for a ten-year prison term.

3. Wallace now contends that she neither consented to nor discussed with her attorney the dismissal motion prior to to the 1984 dismissal.

dismissal of an indictment, information or complaint." Fed.R.Crim.P. 48(a).

Neither the Supreme Court nor our court has resolved the issue of whether a district court has discretion to deny a motion to dismiss consented to by the defendant. *Rinaldi v. United States,* 434 U.S. 22, 29 n. 15, 98 S.Ct. 81, 85 n. 15, 54 L.Ed.2d 207 (1977); *United States v. Weber,* 721 F.2d 266, 268 (9th Cir.1983). We need not reach this issue, however, because we find that Wallace has in any case failed to show any basis for the district court to deny the Rule 48(a) motion to dismiss.

■ While the prosecutor is "the first and presumptively the best judge of whether a pending prosecution should be terminated," *United States v. Cowan,* 524 F.2d 504, 513 (5th Cir.1975), a district court under Rule 48(a) has discretion to deny a government's dismissal motion if that motion is prompted by considerations clearly contrary to the public interest, *see Rinaldi v. United States,* 434 U.S. at 29 n. 15, 98 S.Ct. at 85 n. 15; *United States v. Weber,* 721 F.2d at 268, or if the dismissal would contribute to prosecutorial harassment by subjecting a defendant to "charging, dismissing, and recharging." *Rinaldi,* 434 U.S. at 29 n. 15, 98 S.Ct. at 85 n. 15; *Weber,* 721 F.2d at 268. A fundamental consideration in assessing the propriety of a prosecutor's dismissal motion is whether the motion is made in "good faith." *United States v. Salinas,* 693 F.2d 348, 351 (5th Cir.1982). Wallace contends that the Government's dismissal motion was in fact improperly motivated by its desire to gain a tactical advantage by selecting a more favorable time to reindict her and that its proferred reason for the dismissal was a sham. According to Wallace, dismissal of the 1984 indictment was improper and requires that her 1986 indictment be dismissed. Such motivations or misconduct on the Government's part, if proved, could

establish that the dismissal was sought in "bad faith," such that granting the motion would be an abuse of discretion by the district court. *See Salinas,* 693 F.2d at 352–53 (dismissal motion to obtain a "better" jury constitutes prosecutorial bad faith).

■ The prosecutor stated that the government's desire to prosecute any potential tax code violations together with any narcotics violations was the basis for requesting a Rule 48(a) dismissal. At the time of the dismissal, the prosecutor had information that Wallace had failed to file tax returns in prior years and been previously involved in and convicted for heroin trafficking activities. It would have been reasonable to believe that Wallace had failed to report her income from the sale of narcotics.[4] The fact that tax violations were never charged does not necessarily make the stated reason a "sham." The prosecutor could have concluded subsequently that the government's investigative resources were more efficiently spent developing narcotics charges against Wallace, once Doris Sterling decided to become a government witness in early 1985.

Wallace also contends that the dismissal allowed the government to achieve an improper tactical advantage by reindicting her at a time when she had lost the testimony of a witness and the government had gained the testimony of Doris Sterling. In *Salinas,* the prosecutor moved for dismissal moments before trial, and then reindicted the defendant six days later on essentially identical charges. Under those circumstances, it was clear that the prosecutor sought the blatant tactical advantage of dismissing a jury perceived to be inhospitable to his case, despite his full participation in the selection of the empaneled jury. 693 F.2d at 348–49. Here, by contrast, the prosecutor moved for dismissal a full month in advance of appellants' trial date

---

4. The 1984 return submitted by Wallace to the court showed an adjusted gross income of only $7,890.90, itemized deductions of $8,068.46, and exemptions $2,000, leaving no taxable income, despite the $30,000 cash found in the search of the Seattle residence and property interests in real estate located in Los Angeles and Seattle.

Wallace contends that the tax investigation was a sham because she and her husband filed joint tax returns in the past. The only evidence that Wallace provides are photocopies of a 1983 separate return by Maurice Wallace, not a joint return, and an unsigned 1982 return by Janice Wallace.

and, though not required under Rule 48(a), requested and obtained the consent of Wallace's counsel to the dismissal. These circumstances do not, as in *Salinas,* clearly reveal improper tactical motivations on the prosecutor's part, and Wallace does not allege any other facts that would cause us to question the prosecutor's motive. Dismissal of an indictment would be improper if motivated by the prosecutor's intention that defense witnesses become unavailable. However, as noted above, the prosecutor's exploration of tax violations does not appear to be a sham, so that Wallace's loss of evidence is an incidental, rather than an intended, effect of the dismissal and reindictment.[5] We cannot conclude from this record that the unintentional advantage gained by the prosecution here was improper or improperly motivated.

■ As to the tactical advantage gained by obtaining Doris Sterling's testimony on Wallace's drug trafficking activities, it is not clear to us that the government's dismissal was motivated by its desire to get that testimony or even that such a desire would have been an improper motivation. "An initial [indictment] decision should not freeze future conduct.... [T]he initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution." *United States v. Goodwin,* 457 U.S. 368, 382, 102 S.Ct. 2485, 2493, 73 L.Ed.2d 74 (1982); *see also United States v. Lovasco,* 431 U.S. 783, 792–93, 97 S.Ct. 2044, 2050, 52 L.Ed.2d 752 (1977) (rejecting in part any requirement of immediate indictment upon establishment of probable cause as impairing prosecutor's ability to continue investigation where multiple criminal transactions or actors exist). Once it became clear that Sterling would provide substantial evidence regarding appellants' extensive participation in the heroin distribution activities, it was not improper for the government to recharge Wallace more heavily in the 1986 indictment.

## B. *Sixth Amendment and Due Process Claims*

Appellants also allege that the delay between their initial arrest in the fall of 1984 and the 1986 indictment violated the Sixth Amendment's speedy trial guarantee. We review a defendant's Sixth Amendment speedy trial claim de novo. *United States v. Williams,* 782 F.2d 1462, 1464 (9th Cir. 1985). We may reject the district court's determination of the underlying facts, however, only if it is clearly erroneous. *Id.* at 1468.

■ The Sixth Amendment right to a speedy trial is intended "to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *United States v. MacDonald,* 456 U.S. 1, 8, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982). Of course, once Wallace's 1984 indictment was dismissed, since she was not subject to trial, her Sixth Amendment right to a speedy trial had no application to the delay between her initial arrest and the dismissal. Her Sixth Amendment right to a speedy trial reattached upon her rearrest pursuant to the 1986 indictment, but no undue delay following the 1986 arrest is claimed. *See id.* 456 U.S. at 7, 102 S.Ct. at 1501 ("Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause.") Appellants' Sixth Amendment claim, based on the delay between the initial arrest in 1984 and the return of the 1986 indictment, is without merit because it ignores the intervening dismissal.

■ Pre-indictment delay following dismissed charges may, however, be scrutinized under the Fifth Amendment's Due Process guarantee. *MacDonald,* 456 U.S. at 7, 102 S.Ct. at 1501. First, the defendant must show actual, non-speculative prej-

---

**5.** We also note, as discussed further below, that the prospect of testimony from Wallace's missing witness was so speculative that we doubt the prosecutor would have seen a tactical advantage in that witness's absenting himself.

udice as a result of the delay, *United States v. Moran,* 759 F.2d 777, 782 (9th Cir.1985); and, second, the court must balance the government's reasons for causing the delay against the demonstrated prejudice to the defendant. *Id.* at 781–82; *see also Lovasco,* 431 U.S. at 789–90, 102 S.Ct. at 2048. We review the district court's denial of appellant's motion to dismiss based on the due process clause for an abuse of discretion. *United States v. Rogers,* 722 F.2d 557, 561 (9th Cir.1983).

■ Wallace's argument and proof fail the first prong of the test. She argues that she was prejudiced by the loss of a potential witness, Elmer Ray Penn, who she claims would have testified that she was not involved in any heroin trafficking with the Sterling operation. The assertion itself reveals its speculative nature. Elmer Ray Penn would have been a co-defendant of Wallace and Elmore Penn if he were not a fugitive from justice. Moreover, there is little indication in the record to suggest that Elmer Ray Penn, if available, would have testified favorably for Wallace, if he testified at all.[6] Because we conclude that Wallace failed to establish actual prejudice, we do not consider the reasons for and length of the delay. *Rogers,* 722 F.2d at 562.

## II. *Jencks Act: Production of Witness's Notes*

At trial, Doris Sterling revealed that she had referred to typewritten notes while testifying before the grand jury. Defense counsel questioned Sterling and various law enforcement officers about the content and present location of the notes. Sterling testified that she thought she had left the notes with her attorney, and the prosecutor asserted that the government had never had possession of the notes. After a brief discussion, the district court implicitly found that the government never had the requisite possession of the notes to require their delivery to defense counsel under the Jencks Act, 18 U.S.C. § 3500(b), and directed defense counsel to proceed to other matters. However, at oral argument before this court, the government now concedes that it was aware of Sterling's use of notes while testifying before the grand jury and, for the purposes of the Jencks Act, is "in possession" of the notes.[7]

■ The Jencks Act requires the government to produce any written statements by a government witness that relate to the subject matter of any direct testimony by the witness. 18 U.S.C. § 3500(b). The Jencks Act defines a statement as "a written statement made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1). Sterling's grand jury notes are clearly "statements" within this definition. Sterling referred to and used the notes while testifying before the grand jury, thus "adopting or approving" the notes as her own statements. *See United States v. Goldberg,* 582 F.2d 483, 487 (9th Cir.1978) (notes made by others may be "statements" by witness if read back to or otherwise approved by witness).

■ Production of Jencks Act statements, however, is not automatic: the defendant must submit a proper request to the district court for the government to produce the Jencks statements. 18 U.S.C. § 3500(b); *United States v. Burke,* 506 F.2d 1165, 1167–1168 (9th Cir.1974). How-

---

6. For example, any testimony by Elmer Ray Penn that would exculpate Wallace might incriminate him in the heroin distribution conspiracy. We have previously questioned whether such speculative loss of testimony may ever "qualify for the level of prejudice necessary to establish a due process violation." *Moran,* 759 F.2d at 782. In *Moran,* the defendant claimed that the loss of five witnesses by death and by unavailability established actual prejudice. We stated that the primary source of protection for a defendant from lost testimony is the applicable statute of limitations. *Id.*

7. A district court's denial of a motion to produce a witness's statement pursuant to the Jencks Act is generally reviewed for an abuse of discretion. *United States v. Cowley,* 720 F.2d 1037, 1040 n. 1 (9th Cir.1983). Factual findings underlying the district court's ruling are reviewed for clear error. *United States v. Goldberg,* 582 F.2d 483, 486 (9th Cir.1978). In light of the government's recent concession that it, at least constructively, possessed Sterling's notes, the district court's implicit finding to the contrary must now be viewed as clearly erroneous.

ever, "no ritual of words" is required to assert a proper Jencks Act request. *Ogden v. United States*, 303 F.2d 724, 734–36 (9th Cir.1962). Rather, the defendant must "fairly" direct the attention of the district court to the Jencks Act production issue at an appropriate time and with a demand sufficiently precise to identify the statements requested. *Burke*, 506 F.2d at 1168. Defendant's actions at trial satisfied the standard for a Jencks Act request. The discussion between the district court, the prosecutor, and defense counsel indicates that the court considered and rejected the defendant's inquiry as a Jencks Act request, holding implicitly that Sterling's notes were not producible under the Jencks Act because they were never in the government's possession.[8]

■ We therefore remand to the district court for a determination whether Sterling's grand jury notes should have been produced under the Jencks Act, and if so, whether the failure to produce them at trial resulted in harmless error. The appropriate harmless error standard is unclear at this time. Jencks violations are normally non-constitutional error, *see United States v. Augenblick*, 393 U.S. 348, 356, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969); *United States v. Carrasco*, 537 F.2d 372, 377 & n. 3 (9th Cir.1976), so that a conviction will be affirmed where a Jencks error is more likely than not harmless. *Carrasco*, 537 F.2d at 377 n. 3. However, "[i]t may be that in some situations, denial of production of a Jencks Act type of a statement might be a denial of a Sixth Amendment right." *Augenblick*, 393 U.S. at 356, 89 S.Ct. at 533. Where, as here, the appellant's conviction rests heavily on the credibility of a single accomplice, Sterling, the unproduced Jencks material may well implicate confrontation clause or compulsory process issues. *Cf. Palermo v. United States*, 360 U.S. 343, 362, 79 S.Ct. 1217, 1230, 3 L.Ed.2d 1287 (1958) (Brennan, J., concurring). We cannot answer this question, however, while the notes remain outside the record. In this case, the failure to produce Sterling's notes may have been harmless error because they were fully incorporated into her grand jury testimony, *Carrasco*, 537 F.2d at 377, or because they fail to contain any additional relevant material regarding Sterling's testimony at trial, *United States v. Cowley*, 720 F.2d 1037, 1045 (9th Cir.1983) (Jencks Act only requires production of statements related to the witness's testimony); *but see United States v. Bibbero*, 749 F.2d 581, 585 (9th. Cir.1984) (statements need only relate generally to events and activities testified to by the witness).

If Sterling's notes cannot be produced for the district court's review, then reversal may be warranted. Sterling's testimony was the critical evidence establishing appellant's participation in the heroin distribution network and appellants' defense

---

**8.** The relevant portion of the trial transcript reveals the following testimony by Doris Sterling and discussion with the district court:

Mr. Fenster [defense counsel]: Now, if these aren't the notes, what notes were you looking at when you testified in front of the grand jury?

Ms. Sterling: I don't have them.

Mr. Fenster: What did you do with them?

Ms. Sterling: I think I left them in my attorney's office in Anchorage. I mean, I think I left them with him.

Mr. Fenster: Did Mr. Redkey [the prosecutor] know about those notes?

Ms. Sterling: I'm sure he did if I had them.

Mr. Fenster: May we approach, Your Honor?

The Court: Well, why don't you talk to Mr. Redkey first.

Mr. Fenster: I have, Your Honor.

The Court: Mr. Redkey, do you have the notes?

Mr. Redkey: I don't have them, Your Honor.

The Court: Were you ever aware of them?

Mr. Redkey: I was aware when she was testifying in front of the grand jury she had notes, but I don't have them.

The Court: Were they ever in your possession?

Mr. Redkey: No.

The Court: Were they ever in the possession of any other agency of the United States Government, to the best of your knowledge?

Mr. Redkey: Not to the best of my knowledge.

Mr. Fenster: So the notes have just disappeared, then. Is that—

The Court: No. She said she left them with her attorney.

Mr. Redkey: I just asked Special Agent Ford to check with the Alaskans, and they say, to the best of their knowledge, they don't have them, either.

The Court: All right. Proceed, Mr. Fenster.
TT at 291–292.

rested largely on Wallace's testimony.[9] The jury, therefore, was presented with a direct conflict in the testimony it heard, and its conclusions necessarily depended on whether it believed Doris Sterling's testimony or appellant Janice Wallace's testimony. Any statements in Sterling's notes that might have impeached her testimony might also have tipped the balance of persuasion in favor of appellants. Though striking testimony of a witness whose Jencks Act statements have not been produced may be a remedy in some cases, the centrality of Sterling's testimony to the prosecution's case convinces us that striking her testimony would be of no avail here if the notes have been lost or destroyed. *See Carrasco*, 537 F.2d at 377–78.

### III. *Other Alleged Errors at Trial*

Appellant correctly points out three errors committed by the trial court, in addition to the Jencks error.[10] Because we have determined that a remand is appropriate on the Jencks issue, we decline to engage in an issue-by-issue harmless error analysis on the incomplete record before us. *See United States v. McLister*, 608 F.2d 785, 788 (9th Cir.1979). Even if each of these errors, by itself, is arguably harmless, their cumulative effect may well be prejudicial. *Id.* At this time, we identify the trial court's errors and remand for a determination of prejudice.

### A. *Admission of Prior Heroin Conviction*

Before testifying on her own behalf, Wallace unsuccessfully moved to prohibit the government from impeaching her with evidence of a 1970 heroin trafficking conviction.[11] Wallace contends that the district court improperly denied her motion because: (1) the heroin conviction was time-barred under Rule 609(b), and (2) the dis-

trict court incorrectly balanced the factors involved in determining the probative value versus prejudicial effect of the prior conviction. We review the district court's denial of an *in limine* motion for an abuse of discretion. *United States v. Bagley*, 772 F.2d 482, 487 (9th Cir.1985).

■ Although Wallace's 1970 heroin conviction was more than ten years old, her conviction in 1977 for perjury resulted in a revocation of her parole for the 1970 heroin conviction and her reconfinement in 1977, less than ten years before trial. The district court admitted the heroin conviction, apparently relying on our decision in *United States v. McClintock*, 748 F.2d 1278 (9th Cir.1984), to conclude that appellant's reconfinement in 1977 upon revocation of her parole was "confinement imposed for [the original] conviction" which tolled the ten-year limit of Fed.R.Evid. 609(b). In *McClintock*, the court affirmed the admission for impeachment purposes of a mail fraud conviction that was more than ten years old, because the defendant's subsequent confinement on probation revocation constituted confinement for the original conviction under Rule 609(b). The court relied on the fact that defendant's "probation was revoked for violation of a substantive condition—his failure to refrain from engaging professionally in charitable fund raising—that directly paralleled his original crime—engaging professionally in fraudulent charitable fund raising." 748 F.2d at 1288. The *McClintock* court conspicuously declined to endorse a broad rule that probation or parole revocations always constitute confinement for the original conviction for Rule 609(b) purposes, and we decline to extend *McClintock* here. Because Wallace's perjury conviction was not substantively related or parallel to the original heroin conviction, we conclude that the rev-

---

9. Penn, who did not testify at trial, joins Wallace's assertion of error under the Jencks Act. In addition to statements that could potentially impeach Sterling's testimony, we note that Sterling's notes may contain material that would exonerate Penn as well. Our discussion presumes that either appellant is entitled to production of the Sterling notes under the Jencks Act.

10. Appellants' claims of error aside from those addressed here are without merit.

11. Appellant apparently concedes the admissibility of a prior perjury conviction in 1977 under Fed.R.Evid. 609(a)(2), which presumptively admits prior convictions for crimes involving "dishonesty or false statement, regardless of the punishment." Fed.R.Evid. 609(a)(2).

ocation of Wallace's parole based on the perjury charge does not constitute confinement for the original heroin conviction tolling the ten-year limit of Rule 609(b).

■ Additionally, we conclude that the district court abused its discretion in admitting the heroin conviction under the criteria of Rule 609(a). In balancing the probative value against the prejudicial effect of a prior conviction, this Circuit has stated five factors that the district court should consider.[12] *United States v. Givens*, 767 F.2d 574, 579 & n. 2 (9th Cir.1985). Though we do not require the trial judge to state his or her analysis of each of the five factors with special precision the record should reveal, at a minimum, that the trial judge "was aware of the requirements of Rule 609(a)(1)." *Id.* at 579–80. In this case the district court considered expressly only two of the five factors. As to one of the factors it considered, the district court incorrectly assumed that the similarity of the prior conviction and the present charges weighed in favor of admissibility.[13] In *Bagley*, we stated:

> To allow evidence of a prior conviction of the very crime for which a defendant is on trial may be devastating in its potential impact on a jury ... [W]here ... the prior conviction is sufficiently similar to the crime charged, there is a substantial risk that all exculpatory evidence will be overwhelmed by a jury's fixation on the human tendency to draw a conclusion which is impermissible in law: because he did it before, he must have done it again.

772 F.2d at 488. That risk was clearly present in this case, especially where appellant Wallace's prior perjury conviction was already available for impeachment purposes.[14] The district court abused its dis-

cretion in denying Wallace's motion to exclude her prior heroin conviction.

**B.** *Prosecutorial Vouching*

■ Appellants contend that the prosecutor improperly vouched for the credibility of Doris Sterling, the chief government witness, on three separate occasions. Prosecutorial vouching may occur when the prosecutor either (1) "place[s] the prestige of the government behind the witness" through personal assurances of the witness's veracity, or (2) suggests that "information not presented to the jury supports the witness's testimony." *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980). Because Wallace and Penn failed to object to the prosecutor's alleged vouching, we review appellants' contentions for plain error. *United States v. Gwaltney*, 790 F.2d 1378, 1386 (9th Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987). Under the plain error doctrine, Fed.R.Crim.P. 52(b), we recognize only "those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings,' " *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (citation omitted), and we will reverse " 'solely in those circumstances in which a miscarriage of justice would otherwise result.' " *Id.* We review the alleged error in the context of the entire record to determine whether it rises to the level of "plain error." *Id.* 470 U.S. at 16, 105 S.Ct. at 1047.

■ The first instance of alleged prosecutorial vouching occurred during the direct testimony of Doris Sterling when she testified that she had entered into a plea agreement with the government, part of which required her to testify truthfully.[15]

---

**12.** The five factors are: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness' subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue.

**13.** TT at 661–62. The trial judge stated: "[T]he activities are really quite similar, and so similar, in fact, that I think that the probative value of the prior conviction clearly outweighs the preju-

dicial effect of that testimony as far as the jury is concerned."

**14.** We also note that, even considering Wallace's reconfinement from 1977 to 1980 due to parole revocation, the prior heroin conviction was six years old.

**15.** The prosecutor and Sterling had the following exchange concerning Sterling's plea agreements with the State of Alaska and the United States:

References to truthfulness requirements in plea agreements do not constitute vouching when made in response to attacks on the witness's credibility because of the plea agreement. *United States v. Shaw*, 829 F.2d 714, 716 (9th Cir.1987). Sterling's references to her plea agreement, however, occurred during her direct testimony, before any attack on her credibility. Though Sterling's references to her plea agreement do not "portray [the government] as a guarantor of truthfulness," *Roberts*, 618 F.2d at 537, as directly as statements by the prosecutor himself, they suggest that Sterling, who might otherwise seem unreliable, has been compelled by the prosecutor's threats and the government's promises to reveal the bare truth. The implication, moreover, remains that the prosecutor can verify the witness's testimony and thereby enforce the truthfulness condition of its plea agreement.

 Appellants contend that two other instances of prosecutorial vouching occurred during the prosecutor's closing and rebuttal arguments.[16] The prosecutor's single reference in his closing argument occurred in the context of outlining the evidence corroborating Sterling's testimo-ny. The prosecutor's more pointed remarks during rebuttal argument would clearly be improper vouching, if they were not "invited responses." We must consider the prosecutor's comments in the context of defense counsel's arguments, which repeatedly asserted that the government's key witness was lying.[17] Arguably, the prosecutor's remarks in that context did no more than "respond substantially in order to 'right the scale.'" *Young*, 470 U.S. at 12–13, 105 S.Ct. at 1044–45. The appropriate response by either prosecutor or defense counsel is to make a timely objection to improper comments or behavior and to request a curative instruction. *See id.* Defense counsel made no objection here. The district court instructed the jury that Doris Sterling's testimony should be examined with greater caution as the testimony of an immunized witness as well as of an accomplice. However, the court took no other steps to cure the effect of the prosecutor's remarks, which should not have been made. We do not decide whether the improper vouching rises to the level of plain error, because we cannot review the "entire record" before the Jencks material has been produced.

Q: So your agreement was to plead guilty and you'd get 10 years.
A: Yes.
Q: All right. And that was part of a plea agreement that you entered into?
A: Yes, and I also agreed that I would tell the truth about whatever happened.
Q: And are you testifying here today as part of that plea agreement?
A: Yes, and also with the state of—I mean, with the United States, or whatever.
Q: Can you tell the jury about your agreement with the United States?
A: It was that they wouldn't prosecute me and they would just—or wanted to know the truth about it. So I agreed to tell them.

TT at 215–16.

16. During his closing statement, the prosecutor stated:

Now, Doris Sterling got a deal, if that's what you want to call it, a 57 year old lady got ten years for dealing a lot of heroin in Anchorage, but I submit to you that she told the truth, that getting ten years was not enough for her to manufacture a lie against Janice Wallace or son [Elmore Penn's nickname], for that matter.

TT at 729. During his rebuttal argument, the prosecutor discussed Sterling's credibility several times:

But I submit to you that on the important points she was believable.... But she didn't say that because that would not have been the truth....
[S]he could have gilded the lily, she could have really buried Janice Wallace. I mean beyond—to the point where we wouldn't even be here, but she didn't do that, she told the truth.
Then she left Mr. Fenster room to argue. If she were truly out to get Janice Wallace, she could have given a lot more details ... But she didn't. On the important points she told you the truth.
Now, she could have done the same to Son ... She didn't gild the lily, she told it as it was, and let the chips fall where they may.

TT at 771–72.

17. For example, defense counsel Fenster in his closing argument stated: "Well, you don't have to scrutinize her testimony very closely, ladies and gentlemen. The woman is a liar." TT at 738. *See also* TT at 739, 742, 749.

## C. *Admission of Post–Arrest Statement*

During the October 26 search of the Seattle residence, Wallace was arrested and given a *Miranda* warning. *Miranda v. Arizona*, 384 U.S. 436, 473, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). While Wallace was being transported to the Marshall's office, DEA agent Brehm explained to Wallace the potential benefits of her opportunity to cooperate with the government. Wallace, for a time, said nothing, but eventually, she responded: "I didn't sell no heroin to Doris." TT at 7, 38. The government introduced the statement into evidence at trial.[18]

Wallace contends the district court erred in finding that she had waived her *Miranda* rights after arrest and that her post-arrest statements were admissible. We review the district court's finding that appellant Wallace waived her *Miranda* rights under the clearly erroneous standard. *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir.1986). To establish a valid waiver, the government must show that the defendant knowingly and voluntarily waived her *Miranda* rights. *North Carolina v. Butler*, 441 U.S. 369, 372–73, 99 S.Ct. 1755, 1756–57, 60 L.Ed.2d 286 (1979). Where the waiver of a fundamental constitutional right is at issue, the burden is a heavy one because this court must afford the defendant "every reasonable presumption against waiver." *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir.1984) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

 There is no evidence of an express waiver of *Miranda* rights in this case.[19] In the face of repeated questioning by Agent Brehm, Wallace maintained her silence for several minutes and, perhaps, as many as ten minutes. *See Heldt*, 745 F.2d at 1277 (refusal to sign waiver form suggests defendant, who subsequently talked to police officers for three hours, did not intend to waive *Miranda* rights). The Supreme Court in *Miranda* warned that "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." 384 U.S. at 475, 86 S.Ct. at 1628. Moreover, Agent Brehm's questioning, after Wallace's initial refusal to respond, violated an express directive of *Miranda:* "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. at 1627.[20] We conclude that Wallace did not waive her rights, and that the district court clearly erred in concluding otherwise. The statements should have been suppressed.

## D. *Cumulative Error*

 Although each of the above errors, looked at separately, may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial to the appellants that reversal is warranted. *See United States v. Berry*, 627 F.2d 193, 200–01 (9th Cir.1980); *United States v. McLister*, 608 F.2d at 788. Our court is particularly sensitive to allegations of prejudice where, as here, the convictions are based on the largely uncorroborated testimony of a single accomplice or co-conspirator. *See United States v. Hibler*, 463 F.2d 455, 459 (9th Cir.1972). Given the

---

18. In response to a second query by Agent Brehm, appellant stated: "I didn't sell any heroin to Doris and she can't say that I did." This also was introduced at trial.

19. The government does not contest that Agent Brehm's questioning constituted an "interrogation" for *Miranda* purposes. *United States v. Disla*, 805 F.2d 1340, 1347 (9th. Cir.1986). Agent Brehm asked Wallace: "How long have you known Doris Sterling?" TT at 7. This

question was "'likely to elicit an incriminating response.'" *Id.* at 1347 (quoting *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir.1981)).

20. A subsequent statement by Wallace reveals her intention to invoke her Fifth Amendment rights. In response to Agent Brehm's final query regarding the $30,000 cash found in the Seattle residence, Wallace replied: "Well, I'll tell my attorney about the money." TT at 8.

centrality of the credibility contest between the defendants and the co-conspirator witness, we are particularly troubled by the possible cumulative effect of those errors which go to the credibility of the witnesses: the Jencks violation, the improper admission of the heroin conviction, and the prosecutorial vouching. In this context, we do not find that a balkanized, issue-by-issue harmless error review would be very enlightening in determining whether the appellants were prejudiced by the errors.[21]

## CONCLUSION

We REMAND to the district court for further proceedings consistent with this opinion. The district court should determine the prejudicial effect, if any, of the errors noted herein both separately and cumulatively. If appropriate, the district court may vacate either or both of appellants' convictions. Any further appeals in this action should be directed to this panel.

---

**21.** Normally, a "cumulative error" analysis considers "all errors and instances of prosecutorial misconduct which were preserved for appeal with a proper objection or which were plain error." *United States v. Berry,* 627 F.2d at 200. The *Berry* court noted that its "decision to invoke the plain error doctrine is influenced by the degree of prejudice caused. The cumulative impact of several errors might therefore be sufficient to persuade us to grant review when the impact of each would not. We do not decide whether several errors may constitute 'plain error' in the aggregate or whether, once we decline to review an error, we may no longer consider it for any purpose." *Berry,* 627 F.2d at 201 n. 7. Answering the question left open in

*Berry,* we conclude that we may consider the prosecutorial vouching on cumulative error review. Although the vouching was unobjected to at trial and may not alone amount to plain error (this cannot be determined until the vouching is reviewed in the context of the Jencks material), it is, in any event, relevant to the central issue of Sterling's credibility. Considered with the conduct that was error, the vouching may have contributed to prejudice to the appellants.

