Michael R. EVANS, Petitioner,

v.

Peter DEMOSTHENES,
et al., Respondents.

No. CV–N–89–504–ECR.

United States District Court,
D. Nevada.

Sept. 29, 1995.

**1254**

John Lambrose, Asst. Federal Public Defender, Las Vegas, NV, Federal Public Defender, Reno, NV, for Petitioner.

Attorney General of the State of Nevada by Robert Wieland, Deputy Attorney General, Carson City, NV, for Respondents.

### ORDER

EDWARD C. REED, Jr., District Judge.

Michael Evans, also known as Michael Dulin, was convicted of burglary and grand larceny in 1988, in the state trial court in Las

Vegas. His state court remedies exhausted, Evans sought a writ of habeas corpus from this court. We denied it. The court of appeals affirmed on all but one issue, remanding for consideration of Evans's claim that his confession to the crime was obtained in violation of his *Miranda* rights and should not have been admitted at his trial. That claim is without merit and, once again, we deny the petition.

Early on the morning of November 1, 1987, Las Vegas police officers Thomas Johnson and Arthur Burns were assigned to investigate a burglary. Doc. # 39 Exh. MM at 157–58.[1] Evans and his roommate, Daniel Barsch, were suspects. Tr. 158–59. The officers went to Evans and Barsch's apartment on Casino Center Drive in Las Vegas, took both men into custody, handcuffed them, and took them to a balcony-walkway outside the second-story apartment. Tr. 161–62. Each was given, and verbally acknowledged, his *Miranda* rights. Tr. 162. Evans made it clear that he knew his rights, interrupting Johnson in what Johnson described in this court as a "deliberate, sarcastic" tone. As Johnson explained,

> [w]hile I was reading the rights, he said he knew his rights, and I just told him to just be quiet and let me read the rights and tell me if you understand them as I read them, and after I had done that, he said yes, he understands them.

Tr. 154. The stolen property, which witnesses stated had been in the apartment less than half an hour before, Tr. 162, was nowhere to be seen, and both Evans and

Barsch were sweating "profusely" and had mud on their shoes. Tr. 162–63.

The officers took the suspects downstairs, to the front or side of the building, where they separated the two to speak with them individually. As Burns put it on direct examination:

> Officer Johnson took Mr. Barsch a few feet away so that he could speak with him independently, and I spoke with Mr. [Evans]. My—my conversation with Mr. [Evans] was extremely one-sided, as he didn't respond to me. He didn't answer any questions. He didn't say anything, just that he was complaining of some sort of a stomach ailment.

Tr. 163. Burns said the same thing when cross-examined by Evans (who represented himself):

> Q. Didn't you testify just a minute ago that you said when you had us downstairs in front, that you said I said I had nothing to say?
>
> A. That you say you had nothing to say? I said you didn't say anything. You complained of stomach pains and something, some sort of—or you didn't even ask. An officer told you you could sit down if you were getting dizzy or having a kind of medical problem.

Tr. 169–70. That is consistent with Burns's testimony in this court.[2] This was apparently the first sign that Evans was in physical discomfort; there is no indication that he was in distress when Johnson, only a few moments earlier, gave him his *Miranda* warnings. In this court, Burns testified that Ev-

---

1. Exhibit MM to document 39 in the record is the trial transcript. We held an evidentiary hearing. The facts elicited at that hearing sometimes elaborated upon, but did not contradict, those brought out in the state trial court hearing almost eight years ago, and for our statement of the facts we rely primarily on the transcript of the state court proceeding, which we cite as "Tr.", as far closer in time to the events at issue and hence more detailed and reliable. A few supplementary facts are taken from testimony offered at this court's evidentiary hearing.

2. It is also consistent with the testimony given by Officer Johnson, who explained at the evidentiary hearing that he was interrogating Barsch about twenty feet away and heard Evans complaining, in a loud voice, of stomach pains. In

the state trial court, Johnson testified that, after the officers took the suspects downstairs and separated them for questioning,

> [a]t one point, [Evans] felt faint and I told him to sit on the ground if he was—felt nauseous and felt that he was going to pass out, and that's the only other conversation I had with him.
>
> Q. Did he respond to your request to sit on the ground?
>
> A. Yes, he did. He did sit on the ground.
>
> Q. Did he ever pass out or appear to be ill?
>
> A. No. I didn't—I don't know. I left the—I left him from that and went searching for the property that had been burglarized. . . .

Tr. 155.

ans's response to his questions consisted not of words but of physical gyrations, and that Evans was "agonized," "writhing," and sweating.

This encounter lasted for about five minutes, though Burns testified in this court that his verbal exchanges with Evans likely lasted for a shorter period (somewhere between one and five minutes), and that he recalls asking Evans only where the stolen property was. Burns then gave up trying to question Evans, and, leaving him and Barsch in the custody of other officers, went to the back of the apartment building to look for the stolen property. Tr. 164. In this court, Burns testified that Evans, at this point, was in "physical distress": sitting on the ground, sweating, with his head down. Burns searched a dumpster without success and returned to the front of the building, when another officer, Harris, approached him. Harris said that Barsch had told him that the stolen property was behind the building; Harris and Burns then returned to the rear of the building and found the property. Tr. 164–65.

Once again, Burns returned to the front of the building. About fifteen to twenty minutes had elapsed since Evans and Barsch had been given their *Miranda* rights. Tr. 163. There is no indication that Evans was still in physical distress at this point; whatever affliction he had been suffering during his first encounter with Burns had, apparently, abated. Burns told Evans that he had found the property and asked if Evans had placed it there. Tr. 165. Evans did not respond, *id.*, and Burns then mentioned that he worked primarily with "outlaw bikers," who, once caught, usually admitted quite freely that they had committed the crime, and said that he "couldn't understand why [Evans] wouldn't make a statement concerning this with all the evidence against him." Tr. 165. Burns said the same thing on cross-examination by Evans:

Q. That you were telling me repeatedly of all the evidence that was against me already.

A. Correct. I told you exactly of the things that indicated that you were perhaps responsible for this crime.

Tr. 170. Evans and Burns then began to talk, in Burns's words, "about a lot of things":

We were talking about our families. We were talking about his alleged crime and escape from Utah, how that occurred, why he was being charged from another jurisdiction with a grand theft auto. We spoke about all those kinds of things—where he'd come from, how long he'd been out of prison, . . . .

And then I asked, "Why did you do this, then?" And he indicated to me at that time, that he knew the victim, . . . and that he had had some sort of a disagreement with the victim. . . . . And that the motive for the burglary was revenge, . . . .

Tr. 165–66. The conversation continued. Burns had called for an I.D. technician when he found the property. When the technician arrived, Burns asked Evans "Should I go ahead and have him fingerprint the—the evidence or property in the back, or are you going to admit to having put it there?" Evans responded, "I did it." Tr. 166. Burns told the technician to simply photograph the property, rather than take fingerprints.[3] Evans and Barsch were arrested and taken to the Clark County Detention Center. Tr. 167.

At trial, Evans objected to admission of the confession. A suppression hearing was held on March 22, 1988, outside the presence of the jury, Tr. 150–72, at which the facts set forth above were brought out. Evans conveyed the essence of his theory in one of his questions to Burns:

Q. So, in fact, if the defendant is not answering questions, if he is being silent, why would you continually ask him ques-

---

**3.** At the evidentiary hearing in this court, Burns recalled the sequence of events differently, stating that the exchange involving the I.D. technician, during which Evans confessed, occurred before, not after, his extended conversation with Evans. We adopt the facts as set out in the state trial court's suppression hearing, however, because Burns's testimony about these events was likely more accurate eight years ago than it is today. In any event, this discrepancy makes little difference either way.

tions? He's invoked his rights by remaining silent.

Tr. 169. The state court judge denied the motion to suppress. Tr. 171. Evans asked for an explanation, to which the judge responded:

> Because two officers under oath testified and they said that they read you the Miranda rights. You said you understood them. Later on, you started to speak to them.
>
> THE DEFENDANT: Your Honor—
>
> THE COURT: They never said that you asked for an attorney.
>
> THE DEFENDANT: Your Honor, but the—the—what the—
>
> The cases I have cited to you in the motion all clearly state that once a—once a suspect indicates that he wishes to remain silent, and that he's remaining silent, that there should be no further interrogation at that time. Interrogation must cease.
>
> THE COURT: Well, I'm denying the motion.

Tr. 171–72. Evans's confession was admitted. He was convicted, and sentenced, as a "habitual offender" (he had at least three prior felony convictions), to life in prison with the possibility of parole. Doc. # 39 Exh. RR at 9.

The Nevada Supreme Court dismissed Evans's appeal in June 1989. Doc. # 5 Exh. E. Relying on a Colorado Court of Appeals decision, *People v. Cooper*, 731 P.2d 781, 784 (1986), for the proposition that "a defendant's silence, without more, is insufficient to require the police to discontinue questioning," the court held, in relevant part, that

> [Evans's] contention that he invoked his right to remain silent by his initial unresponsiveness to police questioning is also without merit. While a defendant may indicate in any manner that he wishes to remain silent, he nonetheless must "indicate" his desire. [Evans] has had frequent dealings with the police. It is difficult to comprehend why he did not affirmatively invoke his right to remain silent if he truly did not wish to answer questions. The [state trial] court did not err in denying [Evans's] motion to suppress.

*Id.* at 5 (citation omitted). The state trial court and the state supreme court denied Evans's motion for post-conviction relief. Doc. # 26 Exhs. W & Z. We denied Evans's habeas petition, noting, with respect to his claim that his initial silence in response to questioning was itself an invocation of his right to remain silent, that he had cited no authority for his position. Doc. # 40 at 7.

The Ninth Circuit affirmed in all respects but one. Evans argued in his brief to the court of appeals that he had "invoked his right to remain silent by his conduct. In other words, his refusal to answer any of the officer's questions was an obvious invocation of that right and any objective observer would have drawn that conclusion." Doc. # 59 Exh. A at 30. In response, the circuit remanded, *see* Doc. # 51 at 7, for reconsideration of the issue in light of *United States v. Wallace*, 848 F.2d 1464 (9th Cir.1988), in which the court held that Wallace's continued silence, in the face of up to ten minutes of questioning, was an invocation, rather than a waiver, of her *Miranda* rights. *Id.* at 1475; *see also Terrovona v. Kincheloe*, 912 F.2d 1176, 1180 (9th Cir.1990).

## I. *Evans's argument*

Evans's theory here builds on that asserted in his prior appeal: his silence in response to Burns's questions during their brief initial encounter (after Evans was taken downstairs to the front of the building, and before Burns left him to go look for the stolen property) was itself an invocation of his right to remain silent, and Burns's questioning of him during their second encounter (after Burns found the stolen property at the rear of the building) therefore constituted a renewed interrogation, one clearly not initiated in accordance with the criteria set out in *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975), and the results of which (i.e., Evans's inculpatory statements and confession) were therefore *inadmissible* at his trial. *See* Doc. # 59 at 3–8.

## II. *Evans did not assert his right to remain silent*

We begin by asking whether Evans ever invoked his right to remain silent. Whether

that is a factual question entitled to the deference normally accorded findings of fact by state court, *see Bobo v. Kolb,* 969 F.2d 391, 397 (7th Cir.1992), or a mixed question of law and fact reviewed de novo is, it seems, not settled in this circuit. *See Franklin v. Duncan,* 884 F.Supp. 1435, 1447 (N.D.Cal. 1995). We need not decide which standard of review applies: the state trial court made no relevant factual finding; and, following the Colorado case cited above, the state appellate court clearly believed that silence in the face of questioning is, as a matter of law, not itself sufficient to invoke the right to remain silent, a position which runs counter to the Ninth Circuit's *Wallace* decision. We will review the question de novo.[4]

### A. Davis's "clear invocation" rule applies to the right to remain silent in this circuit

■■■ The state, responding to Evans's argument that his failure to answer Burns's initial questions was itself an invocation of his right to remain silent, labels "absurd" the proposition "that a defendant can invoke his *Miranda* rights by doing nothing more than remaining silent." Doc. # 58 at 8. The

state's view would be correct if the right at issue were the right to counsel; at issue here, however, is the right to remain silent. The two rights are distinct,[5] and while, under *Davis v. United States,* — U.S. —, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the right to counsel must be invoked unambiguously,[6] it is not clear whether the same is true of the right to remain silent.

Our first task, then, is to determine whether *Davis*'s rule, that questioning may continue until the right to counsel is invoked with the requisite level of clarity, would be applied to the right to remain silent in this circuit.[7] *Miranda* itself requires that interrogation cease if the individual "indicates *in any manner,* at any time prior to or during questioning, that he wishes to remain silent," *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1626–27, 16 L.Ed.2d 694 (1966) (emphasis added), and this suggests that *Davis*'s "clear articulation" rule should not be extended to the right to remain silent. Indeed, before *Davis* was decided, many courts held that one way to invoke the right to remain silent is to remain silent when questioned;[8] this was thought an equivocal

---

4. The state court judge did make a few statements which we think qualify as factual findings (i.e., that Evans was given his *Miranda* rights, acknowledged them, later spoke to the police, and never asked for a lawyer). Tr. 171–72. These find clear support in the record, and in any event the right to counsel is not at issue and the other factual findings are undisputed.

5. *Arizona v. Roberson,* 486 U.S. 675, 683, 108 S.Ct. 2093, 2098–99, 100 L.Ed.2d 704 (1988); *Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *Michigan v. Mosley,* 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 326 n. 10, 46 L.Ed.2d 313 (1975) (*Miranda* "distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney"); *United States v. Hsu,* 852 F.2d 407, 411 n. 3 (9th Cir.1988).

6. A suspect "need not 'speak with the discrimination of an Oxford don,'" but "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis,* — U.S. —, —, 114 S.Ct. at 2355. The police may continue questioning the suspect until a request for counsel is made with "the requisite level of clarity." *Id.*

7. Our task is not to "embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant," but, rather, to "divine," as best we can, "what would be the event of an appeal" in this case. *Spector Motor Serv. v. Walsh,* 139 F.2d 809, 823 (2d Cir.1944) (L. Hand, J., dissenting). If a change is "plainly foreshadowed," *id.,* we cannot turn a blind eye.

8. In addition to *Wallace,* which is apparently the only Ninth Circuit case on point, *see United States v. Montana,* 958 F.2d 516, 518 (2d Cir. 1992) (defendant refused to answer pedigree questions; "[i]f a suspect refuses to answer even non-incriminating pedigree questions, the interrogating officer cannot reasonably conclude that he will immediately thereafter consent to answer incriminating ones"; "a defendant's silence in the face of repeated questioning has been held sufficient to invoke the Fifth Amendment privilege, or at least sufficient to create an ambiguity requiring the authorities either to cease interrogation or to limit themselves to clarifying questions") (citations omitted); *United States v. Hernandez,* 574 F.2d 1362, 1368 & n. 10 (5th Cir. 1978) (defendant was given his rights and "invoked his right to remain silent through his refusals to cooperate"); *United States v. Dell'Aria,* 811 F.Supp. 837, 844 (E.D.N.Y.1993) ("silence in the face of custodial questioning aimed at elicit-

method of asserting the right, but sufficient to require that interrogation cease immediately, with only "clarifying" questions allowed.[9]

Almost every court to consider the question, however, has held that *Davis* 's "clear articulation" rule does apply to the right to remain silent.[10] The Minnesota Supreme Court has explained why this is so: in *Davis*, the Supreme Court held that "the Constitution does not require police officers to confine their questioning to clarifying questions when an accused ambiguously or equivocally attempts to invoke his right to counsel"; under *Edwards*, the right to counsel is afforded greater procedural protection than the right to remain silent; it follows "by even greater logic," then, that "the Constitution does not require such a clarifying approach when an accused ambiguously or equivocally attempts to invoke his right to remain silent." *State v. Williams*, 535 N.W.2d 277, 284–85 (Minn. 1995).

Despite the Ninth Circuit's earlier holdings in *Nelson v. McCarthy* and *United States v. Garcia–Cruz*, then, we conclude that the court of appeals, in light of the Supreme Court's subsequent decision in *Davis*, would extend *Davis* 's "clear articulation" rule to the right to remain silent; that, because Evans never clearly invoked that right, Burns was free to interrogate him; and that Evans's confession, as the product of that interrogation, was therefore properly admitted.

## B. *Evans did not remain silent*

[5] Evans would still lose on this point, moreover, even if we assume that the Ninth Circuit would not extend *Davis* to cover invocations of the right to remain silent, and that Evans is therefore correct when he argues that silence in the face of interrogation can itself constitute an invocation of that right. The flaw lies in his assertion that his behavior in this first encounter with Burns manifested a "decision to avail himself of his Fifth Amendment right to remain silent in the face of the interrogation." Doc. # 59 at 4.

We cannot agree, for a simple, factual reason: Evans did *not* remain silent. At all levels, starting with Evans's argument at the

9. *See also Nelson v. McCarthy*, 637 F.2d 1291, 1296–97 (9th Cir.1980) (equivocal assertion of a constitutional right requires that interrogation cease); *United States v. Garcia–Cruz*, 978 F.2d 537, 542 (9th Cir.1992) (after right to remain silent was waived, even equivocal invocation of right to revoke the waiver and remain silent would have required an end to interrogation).

10. *See Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir.1994) ("the same rule should apply to a suspect's ambiguous or equivocal references to the right to cut off questioning as to the right to counsel" and, faced with an "ambiguous or equivocal" statement, the police therefore "have no duty to clarify the suspect's intent, and they may proceed with the interrogation"); *see also United States v. Sanchez*, 866 F.Supp. 1542, 1559 (D.Kan.1994) (following *Coleman*); *United States v. Lincoln*, 42 M.J. 315, 320 (C.M.A.1995) (same); *State v. Bacon*, 658 A.2d 54, 65 (Vt.1995) (same). The Ninth Circuit reached the same conclusion in a disposition which is unpublished and therefore not precedential. *See United States v. Jernigan*, No. 94–10337, 1995 WL 268109 (9th Cir. filed May 4, 1995). We know of only one court which has reached to opposite conclusion. *See State v. Strayhand*, No. 1CA–CR92–1386, 1995 WL 525585, at *14 — Ariz. ——, ——, — P.2d ——, —— (Ariz.Ct.App. Sept. 7, 1995).

ing only pedigree information, even absent substantive inquiries, may suffice as an invocation of Fifth Amendment rights"); *Watson v. State*, 762 S.W.2d 591, 597–600 (Tex.Crim.App.1988) (same; an especially thorough discussion of the matter). *See generally* LaFave, *supra*, § 6.9, at 531 nn. 58–59 (1984 & Supp.1991) (also noting state court decisions to the contrary).

Until its recent decision in *Coleman v. Singletary*, 30 F.3d 1420 (11th Cir.1994), the Eleventh Circuit took the same approach. *See United States v. Ramsey*, 992 F.2d 301, 303, 305 (11th Cir.1993) (defendant was read, and acknowledged, his *Miranda* rights; asked whether he wanted to make a statement, he looked at the DEA agent and then looked away; agents understood this to mean that he did not want to talk; "[o]ne way an individual can invoke his right to remain silent is by refusing to speak"); *Jacobs v. Singletary*, 952 F.2d 1282, 1292 (11th Cir.1992) ("[a]lthough Jacobs had not expressly invoked her right to remain silent, by repeatedly refusing to speak at all to [the detective], even to the point of not giving her name, Jacobs provided at least an equivocal or ambiguous indication that she wished to remain silent"); *United States v. Pena*, 897 F.2d 1075, 1081 (11th Cir.1990) ("[w]here a defendant's post-*Miranda* utterance is an ambiguous expression of his desire to remain silent, that utterance should receive the same treatment as naked silence") (*quoting United States v. Johnson*, 558 F.2d 1225, 1228 (5th Cir.1977)).

suppression hearing, Tr. 172, continuing through the Nevada Supreme Court's dismissal of his appeal, Doc. # 5 Exh. E at 5, our dismissal of his habeas petition, Doc. # 40 at 7, and the Ninth Circuit's remand, Doc. # 51 at 6–7, the assumption—no court has ever made factual findings on this question—seems to have been that Evans maintained his silence in the face of prolonged questioning by Burns. But that is just not so. We have read the trial transcript, and though Evans focuses on Burns's testimony in the state court that their initial conversation was "extremely one-sided," and that Evans "didn't respond," "didn't answer any questions," and "didn't say anything," Tr. 165, a review of both Burns's and Johnson's testimony reveals that this is incomplete; each testified quite specifically in the state court that Evans's response to Burns's questions was not silence, but complaints about his stomach. Tr. 155, 165, 169–70. Evans may have been unresponsive, but he was not silent.

We must examine the "entire context" in which Evans spoke, then, to "determine if the right to remain silent" was invoked. *See Bradley v. Meachum,* 918 F.2d 338, 342 (2d Cir.1990) (*citing United States v. Goodwin,* 470 F.2d 893, 902 (5th Cir.1972) *and Coppola v. Powell,* 878 F.2d 1562, 1565 (1st Cir.1989)). We have done so, on the basis of the trial transcript and the live testimony given in this court, and conclude that this case bears little resemblance to cases, like *Wallace,* involving assertion by *silence* of the right to remain silent. Factually, it fits, instead, within the class of cases in which the suspect does speak, and later claims that he meant by his words to invoke his right to remain silent. In *United States v. Thierman,* 678 F.2d 1331, 1335 (9th Cir.1982), for example, the Ninth Circuit held that the suspect's query "Can we talk about it tomorrow?" was "more easily construed as a mere request to postpone interrogation on a single subject than an outright refusal to answer any more questions." [11] So too here: we think Evans's complaint that he had stomach pains would be construed by a reasonable, objective observer as indicating, not that he wanted to remain silent, but that he was suffering from stomach pains.

There is, to put it another way, a difference between a suspect who responds to questions by remaining stone-silent for minutes on end, as in *Wallace,* or who gestures in a way that clearly indicates a desire not to speak, as in *Ramsey,* and a suspect like Evans, who responds to questions by indicating that he is in physical distress. Evans cannot reasonably be said to have invoked by implication his right to remain silent.[12] (Because Evans never invoked his right to remain silent, it makes no difference that Burns failed to satisfy the criteria for renewed interrogation set out in *Michigan v. Mosley.* Also, because Burns was free to continue interrogating Evans, it makes no difference whether Burns's description to Evans of the evidence against him constituted interrogation in light of *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).)

---

11. *See also United States v. D'Antoni,* 856 F.2d 975, 980–81 (7th Cir.1988) (in response to questions, a suspect's statement that he had already provided all the information he had was not an invocation of his right to remain silent).

12. At the beginning of their second encounter, Burns, having found the stolen property at the rear of the building, asked Evans whether he had placed the property there. Tr. 165. Burns got no response: "He didn't say anything, I don't think, the first time I asked him." *Id.* Burns also said that he did not understand why Evans would not make a statement in light of all the evidence against him. *Id.* Evans was momentarily silent, before engaging in an extended conversation with Burns on other topics. *Id.* at 165–66. Evans argues that this very brief silence, in response to a single question and a single statement, shows that his "initial inclination was to remain silent." Doc. # 59 at 4.

We disagree. Not every momentary silence in response to a question can reasonably be viewed as an implicit assertion of Evans's right to remain silent. *See United States v. Lorenzo,* 570 F.2d 294, 298 (9th Cir.1978); *United States v. Ford,* 563 F.2d 1366, 1367 (9th Cir.1977); *see also Bobo v. Kolb,* 969 F.2d 391, 397 (7th Cir. 1992). The small number of cases holding that the right to remain silent was invoked by silence in the face of questioning involved not silence simpliciter, but silence in particular factual circumstances such that it could reasonably be understood as indicating one thing: that the suspect did not wish to speak. *See* footnote 8, *supra.*

III. *The admissibility of Evans's confession*

Evans confessed, and the confession was used against him. That was proper only if Evans waived his right to remain silent under *Miranda,* and if that waiver was knowing, intelligent and voluntary. *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628.

A. *Evans implicitly waived his rights*

 We begin, then, by asking whether there was a waiver at all. An express waiver is always preferable, and much litigation could have been avoided had Burns obtained one. But the waiver does not have to be express: "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated," and "the question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." *Terrovona v. Kincheloe,* 912 F.2d 1176, 1179 (9th Cir.1990) (*citing North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–59, 60 L.Ed.2d 286 (1979)) (internal quotation marks omitted).

At the time of the arrest, Evans was thirty years old and, as the Nevada Supreme Court put it, Doc. # 5 Exh. E at 5, had had "frequent dealings with the police." (On the morning he was arrested, Evans was a fugitive, listed as "armed and dangerous." Tr. 161.) When Johnson began to read Evans his *Miranda* rights, Evans interrupted in what Johnson described as a "deliberate, sarcastic" tone, saying that he knew his rights. Johnson began again, and this time Evans expressly acknowledged his rights. When they reached the sidewalk and Burns began to question him, Evans started to complain of stomach pains. This first encounter lasted, at most, five minutes, and Burns testified in this court that his questioning of Evans probably lasted for a period shorter than that. Burns then went to look for the stolen goods. When he returned, about fifteen minutes later, Evans (whose stomach pains had, it seems, disappeared) voluntarily engaged in conversation with him, and, in response to questions which clearly constituted interrogation, confessed. On these facts, we have little trouble concluding that Evans implicitly waived his right to remain silent.

B. *The waiver was voluntary, knowing and intelligent*

 We turn, then, to the question whether Evans's waiver was knowing, intelligent, and voluntary. The voluntariness of a waiver (and the voluntariness of the confession itself) are reviewed de novo, although the state court's subsidiary factual determinations are presumed to be correct. *Derrick v. Peterson,* 924 F.2d 813, 817 (9th Cir.1990). *See also Colorado v. Connelly,* 479 U.S. 157, 169–70, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986). If Evans's confession was voluntary, then so, by definition, was his waiver. *Derrick,* 924 F.2d at 820. Whether a waiver was "knowing" and "intelligent," however, is a separate question. *Id.* A state court's finding that a suspect knowingly and intelligently waived his *Miranda* rights is reviewed for clear error. *Collazo v. Estelle,* 940 F.2d 411, 416 (9th Cir.1991) (*citing Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985)). In this case, however, the state courts made no finding on this issue, and we review it, too, de novo.

 In evaluating the voluntariness of a confession, "the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Derrick,* 924 F.2d at 817. Evans made inculpatory statements in the course of a voluntary conversation with Burns about unrelated matters, and specifically in response to Burns's question "Why did you do this, then?" Tr. 166. He confessed in response to a question, when the police I.D. technician arrived, that clearly constituted interrogation ("Should I go ahead and have him fingerprint the—the evidence or property in the back, or are you going to admit to having put it there?" Tr. 166). But there is absolutely nothing in the record suggesting that Evans was bludgeoned, literally or otherwise, into confessing—no evidence whatsoever that he was subjected to any sort of force, pressure, harassment, coercion or trickery to get him to confess. Both

his waiver and his confession, then, were voluntary.

■ Finally, we have little trouble concluding that Evans's waiver was "knowing and intelligent." He had extensive prior experience with the criminal justice system, including prior felony convictions. When first advised of his *Miranda* rights, he interrupted and stated that he knew them; when advised of them again, in full, he expressly acknowledged them. The transcript indicates that Evans's stomach ailment arose only after he was advised of his rights, and had abated by the time Burns, having found the stolen property at the rear of the building, returned to the front and engaged Evans in a normal conversation. Even if he was still suffering some type of stomach pain, that would surely not indicate that his waiver was not knowing and voluntary.[13]

IV. *Conclusion*

Evans never invoked his right to remain silent, expressly or by implication, instead indicating to the police officers on the scene only that he was feeling ill, and only for a few minutes. On the contrary, he acted in a way that can only give rise to an inference that he knowingly, voluntarily and intelligently waived his *Miranda* rights. We find that the confession was properly obtained and admitted, and we deny the petition for habeas corpus.

**IT IS THEREFORE HEREBY ORDERED** that Evans's **petition (Doc. # 30)** for a writ of habeas corpus is **DENIED.**

The **clerk** shall enter judgment accordingly.

---

**13.** *Compare United States v. George,* 987 F.2d 1428, 1430–31 (9th Cir.1993); *see generally Project: Twenty–Fourth Annual Review of Criminal Procedure,* 83 Geo.L.J. 665, 813 n. 587 (1995) (collecting cases).